IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

**UNITED STATES OF AMERICA**,

                    Plaintiff,

    v.

**1) JEFFREY K. WILSON**,
    [DOB: 01/19/1965],

**2) PAUL R. SALAVITCH**,
    [DOB: 11/28/1960],

    and

3) **PATRIOT COMPANY, INC.**,

                    Defendants.

No. _____

**COUNT ONE**
(Wire Fraud Conspiracy)
**18 U.S.C. § 1349** (all defendants)
NMT 20 Years Imprisonment
NMT $250,000 Fine for defendants 1-2
NMT $500,000 Fine for defendant 3
NMT 3 Years Supervised Release
Class C Felony

**COUNTS TWO - FIVE**
(Major Program Fraud)
**18 U.S.C. § 1031** (all defendants)
NMT 10 Years Imprisonment
NMT $10,000,000
NMT 3 Years Supervised Release
Class C Felony

**COUNT SIX**
(Wire Fraud)
**18 U.S.C. § 1343** (defendant 1)
NMT 20 Years Imprisonment
NMT $250,000 Fine
NMT 3 Years Supervised Release
Class C Felony

**COUNTS SEVEN-EIGHT**
(Money Laundering)
**18 U.S.C. § 1957** (defendant 1)
NMT 10 Years Imprisonment
NMT $250,000 Fine or twice the amount of criminally
derived property
NMT 3 Years Supervised Release
Class C Felony

$100 Mandatory Special Assessment on
Each Count

Forfeiture Allegations

| Count | Statute | Defendant |
|-------|---------|-----------|
| 1 | 18 U.S.C.§ 1349<br>Wire Fraud Conspiracy | All Defendants |
| 2-5 | 18 U.S.C.§ 1031<br>Major Government Fraud | All Defendants |
| 6 | 18 U.S.C. § 1343<br>Wire Fraud | Jeffrey K. Wilson |
| 7-8 | 18 U.S.C. § 1957<br>Money Laundering | Jeffrey K. Wilson |

## I N D I C T M E N T

THE GRAND JURY CHARGES THAT:

## COUNT ONE
### (Conspiracy)

At all times material and relevant to this Indictment:

## INTRODUCTION

1.     Beginning in or about April 2005 and continuing until in or about April 2014, defendants Jeffrey K. Wilson (Wilson), Paul R. Salavitch (Salavitch), and the Patriot Company, Inc. (PCI), in the Western District of Missouri and elsewhere, knowingly and voluntarily devised and participated in a scheme to defraud the United States through materially false and fraudulent pretenses, representations and promises, including false and fraudulent representations that PCI was a Veteran-Owned (VOB) or Service-Disabled Veteran-Owned Small Business (SDVOSB), to obtain approximately $13.8 million in federal government construction contracts for work in approximately nine states to which PCI would not otherwise be entitled.

## BACKGROUND

2.     Corporation   A was incorporated on March 30, 2000, as a construction company in the state of Missouri.  Wilson is Corporation   A's president.

2

3. PCI was incorporated on April 26, 2005, in the state of Missouri, by an associate of Wilson and Salavitch (Associate), with Associate's personal residence listed as PCI's business address. PCI's first annual report identified Salavitch as president and Wilson as secretary.

4. PCI was a pass-through or front company for Corporation A.

5. Corporation A maintained an office at 1606 W. Main Street, Greenwood, Missouri.

6. PCI initially maintained an office at Associate's personal residence in Lee's Summit, Missouri. On July 1, 2011, PCI moved its office to Suite B at Corporation A's office location. On May 24, 2013, after United States Department of Veterans Affairs (VA) inquiries regarding PCI's relationship to Corporation A and PCI's eligibility to receive SDVOSB contracts, PCI moved its office to 11215 Hickman Mills Drive, Suite B, Kansas City, Missouri, to give the appearance of separation from Corporation A. On January 21, 2015, after PCI lost its SDVOSB eligibility, Corporation A Employee A took majority ownership and control of PCI and PCI once again moved its office, this time to Corporation A Employee A's home in Lee's Summit, Missouri.

7. The purpose of this business arrangement was to use Salavitch's Veteran and Service-Disabled Veteran (SDV) status in a "rent-a-vet" scheme, allowing PCI to bid on at least 20 government contracts and receive approximately $13.8 million PCI would not have otherwise been entitled to receive because those contracts were set-aside exclusively for legitimate SDVOSBs or VOBs.

8. At all times relevant to this indictment, Salavitch, a SDV, did not actively control the day-to-day management, daily operation or long-term decision making of PCI.

9. Wilson was 100% owner of Corporation A. On May 1, 2005, he became 15% owner of PCI. On April 24, 2011, Salavitch transferred an additional 15% ownership to Wilson at Wilson's request making Wilson 30% owner of PCI. On January 1, 2014, Wilson sold all of his PCI shares to Corporation A Employee A.

3

10. Salavitch was an SDV who nominally served as president of PCI from July 14, 2005 to April 1, 2014. Salavitch never managed a construction company prior to his involvement with PCI, and he had limited government contracting experience.

11. On April 1, 2014, Salavitch sold all his PCI shares to Corporation A Employee A. On January 27, 2015, Salavitch was removed as a PCI officer and replaced by Corporation A Employee A.

12. Kenleebrook, LLC, the company which owned Corporation A's real property interests, was jointly owned by Wilson.

13. Wilson is not an SDV.

14. None of the contracts PCI was awarded were joint ventures.

15. VA is the federal government agency charged with serving America's veterans and their families in ensuring they receive medical care, benefits, social support and lasting memorials promoting the health, welfare and dignity of all veterans in recognition of their service to the United States.

16. The United States Department of Defense (DoD) is the federal government agency charged with providing military forces needed to deter war and protect the security of the United States.

17. The United States Small Business Administration (SBA) is an independent agency of the federal government responsible for aiding, counseling, assisting and protecting the interests of small business concerns. SBA provided assistance to small businesses which were owned and controlled at least 51% by socially and economically disadvantaged individuals.

18. The United States General Services Administration (GSA) is a congressionally appropriated federal agency overseeing the business of the federal government and is one of the largest contracting agencies in the federal government, supplying federal purchasers with products

4

and services from commercial vendors. GSA houses the System for Award Management (SAM), Central Contractor Registration (CCR) and Online Representations and Certifications Application (ORCA) database systems, where contractors enter and certify details of their company. Government agency contracting offices rely on this information and these certifications to award contracts.

**SDVOSB Program**

19. The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual government-wide goal of awarding contracts to at least three percent of the total value of all federal prime and subcontract awards for small business concerns owned and controlled by SDVs. The Veterans Benefits Act of 2003 added a contracting mechanism to enable agencies to reach this three percent goal.

**SDVOSB Program Eligibility Requirements**

20. To be eligible for the SDVOSB program, the SDV must meet the following criteria:

 a. Have a service-connected disability determined by VA or DoD;

 b. Unconditionally own 51% of the SDVOSB, in which ownership is direct;

 c. Receive 51% of profits and/or the annual distribution profits paid on the stock for the SDVOSB;

 d. Control the day-to-day management, daily operations, and long term decision making of the SDVOSB; and

 e. Hold the highest officer position in the SDVOSB, to include control of the board of directors, if applicable.

5

## Government monitoring of federal contracts

21.     GSA maintains CCR, ORCA and SAM, all located outside the state of Missouri. GSA relies on information in those databases provided by potential contractors to determine eligibility for federal programs including VOB and SDVOSB programs.

22.     Effective October 1, 2010, to protect the SDVOSB program from fraud, VA has required prospective SDVOSBs, upon being tentatively awarded a contract, to complete and submit VA Form 0877 (Form 0877) to VETBIZ Vendor Information Pages (VIP) Verification Program before the contract award becomes final. While Form 0877 language has been updated over time, the requirement to certify that the SDV managed or controlled the day-to-day operations and the long-term decision-making of the SDVOSB remained constant.

## Invoice and payment process

23.     After being awarded a federal contract, the contractor submits invoices to the VA's Financial Service Center (FSC) in Austin, Texas.

24.     When FSC receives a contractor invoice, the invoice is uploaded to the on-line vendor file, triggering notification to review and, if appropriate, approve the invoiced expenses.

25.     Upon VA approval, the invoice is paid electronically from the United States Department of Treasury (Treasury) by way of the Federal Reserve Bank ACH Processing Site in East Rutherford, New Jersey, into the contractor's designated bank account.

6

## Pass-Through or "Front" Companies also known as Rent-a-Vet Schemes

26.     Pass-through companies are illegal under the SDVOSB program.  They operate in the following manner in the context of SDVOSBs:

        a.     The SDVOSB is established by and/or controlled by one or more individuals who are not an SDV;

        b.     The non-SDV has another company, not certified as SDVOSB, that the non-SDV intends to pass the work through to; and

        c.     The non-SDV uses the legitimate SDVOSB to qualify for and obtain set-aside and/or sole-source government contracts and pass much or all of the work and profits through to their non-SDVOSB, which is not entitled to receive the contract.

## Purpose of Scheme

27.     From in or about April 2005 through in or about April 2014, in the Western District of Missouri and elsewhere, Wilson, Salavitch, and PCI, together with each other, and others, both known and unknown to the Grand Jury, knowingly devised a scheme to defraud and obtain money and property by means of material false and fraudulent pretenses, representations and promises by unlawfully obtaining the following VA and Army contracts:

|   | Agency | Contract No. | Award | Award Date | City, State |
|---|--------|--------------|-------|------------|-------------|
| 1 | VA | VA263-RA-0650 | $264,712[1] | 9/24/2009 | Ft. Meade, SD |
| 2 | Army | W91151-10-C-0177 | $99,928 | 9/07/2010 | Fort Hood, TX |
| 3 | VA | VA263-C-1074 | $149,104[2] | 9/23/2010 | Omaha, NE |
| 4 | VA | VA256-C-1235 | $93,100 | 4/12/2011 | Muskogee, OK |
| 5 | VA | VA256-C-1237 | $111,269 | 4/12/2011 | Muskogee, OK |
| 6 | VA | VA251-C-1074 | $1,628,248[3] | 6/16/2011 | Battle Creek, MI |
| 7 | VA | VA256-C-1344 | $4,383,129[4] | 6/22/2011 | Oklahoma City, OK |
| 8 | VA | VA255-C-2136 | $180,972 | 9/14/2011 | Kansas City, MO |

[1] Original contract award: $238,341; four modifications as reflected in ¶ 27.
[2] Original contract award: $143,666; two modifications as reflected in ¶ 27.
[3] Original contract award: $1,324,000; four modifications as reflected in ¶ 27.
[4] Original contract award: $4,295,500; one modification as reflected in ¶ 27.

| 9 | VA | VA255-C-2229 | $1,008,119 | 9/14/2011 | Kansas City, MO |
|---|----|--------------|------------|-----------|-----------------|
| 10 | VA | VA251-C-1103 | $153,440 | 12/15/2011 | Ft. Wayne, IN |
| 11 | VA | VA249-12-C-0089 | $689,881 | 1/24/2012 | Memphis, TN |
| 12 | VA | VA263-12-C-0172 | $281,821[5] | 6/28/2012 | Des Moines, IA |
| 13 | VA | VA786A-12-C-0033 | $25,439 | 8/1/2012 | Danville, IL |
| 14 | VA | VA263-13-C-0129 | $245,095[6] | 5/29/2013 | Des Moines, IA |
| 15 | VA | VA263-13-C-0155 | $775,069[7] | 6/26/2013 | Fargo, ND |
| 16 | VA | VA263-13-C-0177 | $415,850[8] | 6/27/2013 | Omaha, NE |
| 17 | VA | VA263-13-C-0208 | $78,735 | 7/24/2013 | Omaha, NE |
| 18 | VA | VA263-13-C-0210 | $321,876[9] | 7/29/2013 | Grand Island, NE |
| 19 | VA | VA263-13-C-0216 | $2,809,378[10] | 7/31/2013 | Iowa City, IA |
| 20 | VA | VA263-13-C-0281 | $104,357 | 9/30/2013 | Iowa City, IA |
|  |  | **Total:** | **$13,819,522** |  |  |

28.     The first VA contract was awarded to PCI on September 24, 2009, for replacement of hospital windows at Fort Meade, South Dakota, VA Medical Center.  Wilson signed the contract.  Only Wilson or Corporation A's project manager corresponded with VA contracting staff.  Salavitch's signature was not on any document or in any communication with VA contracting staff.

---

[5] Original contract award: $272,226; four modifications as reflected in ¶ 27.
[6] Original contract award: $185,137; seven modifications as reflected in ¶ 27.
[7] Original contract award: $770,651; three modifications as reflected in ¶ 27.
[8] Original contract award: $375,818; two modifications as reflected in ¶ 27.
[9] Original contract award: $312,000; one modification as reflected in ¶ 27.
[10] Original contract award: $2,527,709; eight modifications as reflected in ¶ 27.

8

**Control of PCI**

29.    On September 23, 2009, the day before PCI's first contract was awarded, Wilson sent an email to approximately 19 recipients with the subject, "New Patriot Job." Notably, Salavitch was not included in the recipient list. After congratulating Patriot on getting the job, Wilson reported, "WE STATED UP FRONT IT WAS OUR FIRST JOB, BUT THAT WE WERE PLEASED TO PARTNER WITH [CORPORATION A] AS A MENTOR…. THE SECOND BIDDER WAS UNDER $200K, JUST OVER OUR STATED PRICE. AS I STATED PREVIOUSLY THERE ARE ALSO SEVERAL LOCAL OPPS FOR SDVOSB COMPANIES. HEY, ANY DAMN WORK WE CAN GET THESE DAYS IS GREAT NEWS."

30.    One recipient responded, asking, "what is sdvosb?"

31.    Wilson replied to that recipient, "Service disabled veteran owned small business. Good old govt restricting competition. You either figure out a way to play, or sit on the bench."

32.    On March 30, 2010, when PCI's registered business address was still at Associate's personal residence, Wilson emailed Corporation A employee T.B., "I NEED TO PUT PATRIOT BIDS ALL TOGETHER IN A BOX AND SEND WITH [Associate] TO KEEP AT HOME IN CASE THE WOLF SHOWS UP AT THE DOOR."

33.    T.B. replied to Wilson's email that same day, "Sorry I was not aware I was doing anything wrong with my bids… I will dig out the [PCI] bids …."

34.    Wilson responded by email to T.B., "I have just been worried if the big bad wolf shows up at [Associate's] we don't put up much of a good front. Let's save any drwgs [sic] for patriot too to make the pile look good."

35.    On June 17, 2011, the day after PCI was awarded a $1,324,000 contract in Battle Creek, Michigan, Wilson sent an email with the subject, "PATRIOT." The email was sent to Corporation A employees. Notably, Salavitch was not included in the recipient list. Wilson

9

stated, "CONSIDERING WE HAVE NOW COMPLETED THREE SMALL JOBS, HAVE TWO IN MUSKOGEE KICKING OFF SOON, ANOTHER IN ITHACA, AND THE BIG AWARD IN BATTLE CREEK, WE ARE EXPANDING PATRIOT QUITE EXTENSIVELY." Wilson then instructed Corporation A Employee B to prepare a lease from Kenleebrook to PCI for office space and set up payroll. Wilson instructed Corporation A Employee A to order business cards for PCI employees and noted, "Add Cell numbers. Not on Paul's." The email continued, directing Associate, "I would like for you to get a thing or two from Paul to put in that office that is personal. Anything from his military. Any plaques, or US ARMY stuff or anything that if one stepped into it, it would look and feel like Patriot…."

36.     Less than an hour later on June 17, 2011, Wilson sent an email to Associate as the only recipient. Wilson stated, "I'm sure you have seen the stuff I am sending out today. It is the right direction. Unbelievable we discuss this yesterday morning, then the news last night confirmed it." Wilson continued, "[T]his creates a significant amount of work for me. I have also had a significant amount up to now managing this thing… I would like to bump my ownership up [sic] the 15% to 30% leaving Paul 55%. I think it is fair. For example, if we got Oklahoma City, Patriot would take in $200k of which I would be entitled to $30k and I am doing all the work. I don't think that is unreasonale [sic]. I hate to bring it up and by no means is [sic] an ultimatum. I want to discuss with you what you think is fair. If you do not agree please tell me. Let's keep this open." Salavitch was not included in the email regarding change of PCI ownership shares.

37.     On July 20, 2011, Wilson forwarded an email to five Corporation A employees in which a third party contractor expressed interest working with PCI to bid jobs valued at approximately $2,000,000 to $4,000,000. Wilson added to the forwarded email, "My point to this email is that Patriot is NOW ON RADAR!!!!!! Mission Legit is underway!"

10

38.     On July 25, 2011, Wilson received an email from the VA that a concerned citizen suspected PCI was a pass-through for Corporation A.

39.     It was not until the seventh and eighth contracts awarded to PCI on September 14, 2011, less than two months after the inquiry from a concerned citizen that PCI was a fraud, that Salavitch's signature was first discovered in any of the contract files.

40.     Salavitch then went almost two more years and 11 more contracts before signing another document, a performance bond signed on July 29, 2013.

41.     On November 10, 2011, Wilson sent an email to Salavitch proposing a $75,000 salary for Salavitch and stating, "Please consider all this and we can discuss… It is time to make a final decision.  It is also time for you to start this new venture. …"

42.     At this time, PCI had already been awarded eight SDVOSB or VOB contracts with a total value of over $7,394,000.

43.     On December 19, 2011, Wilson sent an email to Salavitch stating, "we need to discuss your plan for starting work.  I would like for you to come up with a date and lets [sic] move forward.  You last though [sic] sometime in January (mid to late)."

44.     Wilson forwarded the email to Associate on December 25, 2011, and added, "email to paul on 12/19 with no reply.  Not concerned, just fyi."

45.     On December 26, 2011, Associate responded to Wilson by email, stating, "I have touched base with Paul a few times without coming right [sic] and saying anything (didn't want him to think he was not coming over).  Everything I get indicates he is still on board."

46.     By the time of this email exchange, PCI had already obtained nine SDVOSB contracts, yet the SDV, Salavitch was still contemplating the start date of his work with PCI.

47.     On June 15, 2012, Salavitch sent an email to Wilson stating, "Jeff, Wanted to touch base with you, I would like to discuss a part time arrangement with you for Patriot Inc.  I will be

able to committ [sic] to a part time schedule to see how I would like it."  PCI had obtained 10 SDVOSB contracts at this time.

48.     On August 23, 2012, Salavitch emailed 10 recipients, including Wilson, suggesting an agenda for a staff call, as:

> "1) Update on current projects
>
> 2) Update on proposed projects (bids)
>
> 3) Resource Management current fiscal state
>
> 4) Alibis"

49.     Wilson responded to Salavitch's email noting, "You used all of their [Corporation A] emails.  Probably would look better for you to try to use everybody's Patriot emails. …"

50.     On September 14, 2012, VA's Center for Veterans Enterprise (CVE) requested additional documentation from PCI to determine eligibility.  CVE identified PCI and Corporation A shared the same address, phone, and fax numbers.  CVE also learned from Salavitch's 2011 W-2 form that he was employed with Defense Finance & Accounting Service.  In addition, PCI's 2011 W-2 form and 2011 payroll for all employees did not list Salavitch as the highest paid employee.

51.     On September 26, 2012, CVE denied PCI's verified SDVOSB status by concluding Salavitch did not control the Board of Directors, did not dedicate full-time to the business, and a non-Veteran entity was able to exert undue influence over the applicant.

52.     On October 24, 2012, Salavitch, or a co-conspirator using his name, responded to CVE's denial with a "Request for Reconsideration," providing a copy of an amended Corporate By-law that allowed Salavitch to control decisions of the Board of Directors.  Salavitch or his co-conspirator also provided an explanation regarding the amount of time dedicated to PCI and submitted a copy of a lease agreement for a new location in Lee's Summit, Missouri, to prove PCI

12

was no longer co-located with Corporation A. PCI was re-certified by CVE on March 29, 2013, based on the unverified explanations.

53. On March 31, 2013, Wilson sent an email requesting Corporation A be removed as guarantor for PCI's bonded work. Wilson noted PCI lost a bid in June 2010 because the surety letter submitted with the bid showed Corporation A guaranteed PCI bonds and concluded the email, "[o]f course [Corporation A] will be the primary subcontractor on this bid and we are not sure yet how big this job will be, but the estimate is between $500 and 1-mil."

54. On May 1, 2013, Salavitch signed a new two-year lease at 11215 Hickman Mills Drive, Kansas City, Missouri.

55. On September 19, 2013, a CVE examiner conducted an unannounced site visit at PCI's new location. The examiner discovered Salavitch was not present during regular business hours to control day-to-day management; instead, Salavitch was working full-time as a federal employee with DoD at Leavenworth, Kansas, approximately 40 miles away. According to the examiner, during an interview with Salavitch and Wilson, Wilson answered too many of the questions and exerted undue influence over Salavitch.

56. On December 31, 2013, CVE issued PCI a Notice of Verified Status Cancellation based upon CVE's inability to determine Salavitch's involvement with PCI satisfied the control requirements of a SDVOSB.

**Transfer of PCI Ownership**

57. On January 1, 2014, Wilson sold his 30% PCI interest to Corporation A Employee A for $28,000.

58. That same day, Wilson remitted two checks totaling $28,000, one to Corporation A Employee A for $14,000 with the memo "2014 Gift" and one to Corporation A Employee A's husband, also a Corporation A employee, for $14,000 with the memo "2014 Gift."

59. On April 1, 2014, Salavitch transferred his 55% PCI interest to Corporation A Employee A for cash and a car in the approximate total value of $138,000.

## Fraudulently obtained money

60. The contract payments PCI fraudulently obtained were initially disbursed into two different accounts during the conspiracy. From August 16, 2010, to November 5, 2010, as a result of the conspiracy to defraud the federal government, Treasury paid $264,712.00 to PCI as direct deposits into PCI's Community First Bank account ending x0846 (PCI x0846). The illicit funds were maintained in or disbursed and transferred from PCI x0846 to other accounts owned or controlled by the co-conspirators.

61. PCI x0846 was initially opened in May 2005 with a $500 Corporation A check endorsed by Wilson.

62. Additionally, from November 6, 2010, to February 15, 2015, as a result of the conspiracy to defraud the federal government, Treasury paid $11,905,128.09 in illicit funds to PCI by making direct deposits into PCI's Arvest Bank account ending x4047 (PCI x4047).

63. Treasury continued to make payments to PCI on ongoing contracts or contract modifications. The illicit funds were maintained in or disbursed and transferred from PCI x4047 to other accounts owned or controlled by the co-conspirators. PCI money was used for, among other purposes, Wilson's real and personal property purchases, including the following:

## Minnesota Life Insurance Policies

64.     During the scheme, in or about July 2014, Wilson obtained life insurance policies with Minnesota Life.  These policies required annual premiums of $100,000.  In 2014 and 2015, $100,000 annual premiums were made for both policies, with funds originating from PCI x4047.

    a.      On July 28, 2014, the two $100,000 annual premiums were paid from Wilson's joint account at Blue Ridge Bank and Trust Co. ending x9489 (BRBT x9489).
    b.      In or about July 2015, the second two annual $100,000 premiums were paid from BRBT x9489.

    c.      Between January 1, 2014, and February 20, 2015, BRBT x9489 contained at least $857,000 in illicit proceeds originating from PCI Arvest x4047.

## Street of Dreams Home

65.     During the scheme, on or about June 1, 2012, Wilson jointly purchased a $720,000 residence on Street of Dreams in the Village of Loch Lloyd, Missouri (Street of Dreams home).

66.     Wilson wired $449,321.02 from his personal account at Bank of Lee's Summit, account x5208 (BOLS x5208) to Kansas City Title as a down payment for the Street of Dreams home purchase on June 1, 2012. $250,000 of the down payment originated from PCI x4047.

67.     Wilson financed the balance of the purchase price with funds from the sale of his previous home and a $240,000 mortgage.

68.     On April 23, 2013, Wilson paid off the mortgage balance with a check in the amount of $224,613.96 from his joint account at UMB Bank, account ending x8826 (UMB x8826). That same day, $225,000 was transferred from CORPORATION   A's account at Bank of Lee's Summit, account ending x4957 (BOLS x4957) to UMB x8826.  The $225,000 in BOLS x8826 originated from PCI Arvest x4047.

## Arizona Home

69. During the scheme, on June 3, 2014, Wilson sent a $3,500 wire from his BOLS x5208 to Chicago Title Agency as earnest money associated with the purchase of a residence on East Wolf Canyon Circle in Mesa, Arizona (Arizona home).

70. On June 27, 2014, Wilson wired $345,812.53 from his joint account at UMB, account x3691, to Chicago Title Agency, Inc. to pay for the Arizona home in full.

71. Funds for the $3,500 earnest money and $175,000 of the $345,812.53 payment originated from PCI Arvest x4047.

## The Rent-a-Vet Scheme

72. It was part of the scheme to defraud and to obtain SDVOSB program contracts and property by means of material and false pretenses, representations and promises, and in furtherance of the scheme, that the defendants knowingly and intentionally engaged in and caused the following activities:

73. Beginning in April 2005 and continuing through December 2016, both dates being approximate and inclusive, within the Western District of Missouri and elsewhere, the defendants, Jeffrey K. Wilson, Paul R. Salavitch, and Patriot Company, Inc., did knowingly, willfully and with the intent to defraud, conspire and agree together and with each other, and with other persons known and unknown to the Grand Jury, to commit and to conceal the following offenses against the United States:

    a.    to defraud the United States by deceitful and dishonest means by impeding, impairing, obstructing and defeating the lawful government functions of the VA, GSA, and Army, all agencies of the United States, by fraudulently and unlawfully claiming PCI was a SDVOSB and applying for and being awarded at least 20 government contracts under the SDVOSB and VOB programs, which contracts PCI was not legally qualified or entitled to receive, in violation of Title 18, United States Code, Section 1349; and

    b.    in furtherance of the conspiracy, to intentionally cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals and sounds for the purpose of executing such scheme to obtain and attempt to obtain money and property by means of

16

false and fraudulent pretenses, representations and promises to defraud the VA, GSA, and Army, in violation of Title 18, United States Code, Section 1343.

## **Objects of the Conspiracy**

74.     The defendants, through PCI, sought to fraudulently obtain SDVOSB and VOB program contracts.

## **Manner and Means**

75.     It was part of the conspiracy and in furtherance of it, that in order for defendants and their co-conspirators to carry out their scheme to defraud, they falsely, fraudulently and in a misleading manner made representations to the VA, GSA, and Army that PCI qualified for SDVOSB and VOB status when the defendants knew it did not, in order to be awarded at least 20 set-aside or sole source SDVOSB and VOB contracts.

## **Overt Acts**

76.     In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the defendants and conspirators, both indicted and unindicted, committed overt acts in the Western District of Missouri and elsewhere, including the following:

      a.     In support of PCI's application for SDVOSB contracts, on or about the dates below, the named defendants or their co-conspirators falsely represented that PCI was an SDVOSB in the identified database.

| Date | Defendant | Database |
|------|-----------|----------|
| 9/23/2005 | Wilson | ORCA |
| 9/3/2009 | Wilson | CCR |
| 9/17/2009 | Wilson | ORCA |
| 11/17/2009 | Wilson | VETBIZ VIP |
| 11/17/2009 | Salavitch | VETBIZ VIP |
| 8/18/2010 | Wilson | ORCA |
| 6/20/2011 | Salavitch | VETBIZ VIP |
| 6/22/2011 | Wilson | VETBIZ VIP |
| 6/24/2011 | Salavitch | VETBIZ VIP |
| 8/3/2011 | Wilson | ORCA |
| 11/29/2011 | Wilson | ORCA |
| 1/5/2012 | Wilson | CCR |
| 6/20/2012 | Wilson | VETBIZ VIP |

| | | |
|---|---|---|
| 6/20/2012 | Salavitch | VETBIZ VIP |
| 7/18/2012 | Wilson | VETBIZ VIP |
| 7/18/2012 | Salavitch | VETBIZ VIP |

**False representations in obtaining contracts**

b.  On or about the dates listed below, by signing a government contract, the named defendant or a co-conspirator, falsely represented that PCI was a legitimate SDVOSB.

| Date | Defendant | Contract Number |
|---|---|---|
| 4/12/2010 | Wilson | VA263-RA-0650 |
| 9/16/2010 | Wilson | VA263-C-1074 |
| 2/11/2011 | Wilson | VA256-C-1235 and VA256-C-1237 |
| 6/22/2011 | Wilson | VA256-C-1344 |
| 8/7/2011 | Wilson | VA255-C-2136 |
| 8/11/2011 | Wilson | VA255-C-2229 |
| 8/2/2012 | Wilson | VA256-12-C-0326 |
| 3/26/2013 | Wilson | VA263-13-C-0129 |
| 6/18/2013 | Wilson | VA263-13-C-0177 |
| 6/20/2013 | Wilson | VA263-13-C-0155 |
| 7/10/2013 | Wilson | VA263-13-C-0210 |
| 7/25/2013 | Salavitch | VA263-13-C-0216 |
| 9/27/2013 | Salavitch | VA263-13-C-0281 |

All in violation of Title 18, United States Code, Section 1349.

**COUNTS TWO – FIVE**
**(Major Program Fraud against the United States)**

77.  Paragraphs one through 76 are incorporated as though fully set out herein.

It was further a part and object of the conspiracy that Jeffrey K. Wilson, Paul R. Salavitch, and Patriot Company, Inc. unlawfully and knowingly executed and attempted to execute a scheme with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations and promises in a procurement of property and services as a prime contractor with the United States where the value of such contract was $1,000,000 or more, to wit: the defendants falsely represented PCI was eligible for contracts designated for a SDVOSB to obtain the following contracts to perform construction and services for the VA:

18

| Count | Contract | Location | Award | Award Date |
|-------|----------|----------|-------|------------|
| 2 | VA251-C-1074 | Battle Creek, MI | $1,324,000[11] | 6/16/2011 |
| 3 | VA256-C-1344 | Oklahoma City, OK | $4,408,960 | 6/22/2011 |
| 4 | VA255-C-2229 | Kansas City, MO | $1,008,119 | 9/14/2011 |
| 5 | VA263-13-C-0216 | Iowa City, IA | $2,527,709 | 7/31/2013 |

All in violation of Title 18, United States Code, Section 1031.

**COUNT SIX**
**(Wire Fraud)**

78.     Paragraphs one through 76 are incorporated as though fully set out herein.

79.     Yahoo! hosted electronic mail accounts for **vetcontractor@yahoo.com** and **thewilsongroup@yahoo.com.** The server that contained the virtual hosting for these electronic mail accounts was located in Sunnyvale, California, so any electronic mail sent from and received by those accounts traveled through Sunnyvale, California.

80.     Wilson commonly used the email address vetcontractor@yahoo.com as his main email for PCI.

81.     It was further part and object of the conspiracy that Jeffrey K. Wilson, having devised a scheme to defraud the VA, GSA and Army to obtain and attempt to obtain money and property by means of false and fraudulent pretenses, representations and promises, and knowingly and intentionally caused to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals and sounds for the purpose of executing such scheme, to wit:

---

[11] With modifications, the current value of this contract is $1,628,248.

19

| Count | Defendant | Date of Offense | Wire Transfer Amount | Point of Origin/ Point of Receipt |
|---|---|---|---|---|
| 6 | Wilson | April 3, 2013 | $486,296.66 | VA Financial Service Center, Austin, TX / PCI x4047, Arvest Bank, Lee's Summit, MO |

All in violation of Title 18, United States Code Section 1343.

## COUNTS SEVEN through EIGHT
### (Money Laundering)

82.     Paragraphs one through 76 are incorporated as though fully set forth herein.

83.     On or about the dates set forth below, Jeffrey K. Wilson knowingly and intentionally engaged in monetary transactions in criminally derived property of a value greater than $10,000 which was derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, funds in PCI x4047, which Wilson knew were obtained as a result of the fraud scheme, were transferred through other accounts controlled by Wilson, until they were deposited into the Originating Accounts identified herein and were then utilized in the following money laundering violations:

| Count | Date | Transaction | Criminally Derived Property | Originating Account holding illicit funds | Recipient | Purpose |
|---|---|---|---|---|---|---|
| 7 | 06/01/2012 | Wire transfer | $225,000 of $449,321.02 wire | BOLS x5208 | Kansas City Title | Street of Dreams home down payment |
| 8 | 06/27/2014 | Wire transfer | $175,000 of $345,812.53 wire | UMB x3691 | Chicago Title Agency, Inc. | Payment in full for Arizona home |

All in violation of Title 18, United States Code, Section 1957.

## Forfeiture Allegation I (wire fraud and wire fraud conspiracy)

84.     Upon conviction of a violation identified below in this allegation, the United States intends to pursue forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any property real or personal, including, but not limited to the assets described herein, which constitute or are derived from proceeds traceable to the offense to which the identified defendant is convicted:

| Count | Statute | Defendant |
|-------|---------|-----------|
| 1 | 18 U.S.C.§ 1349<br>(Wire Fraud Conspiracy) | 1-3 |
| 6 | 18 U.S.C. § 1343<br>(Wire Fraud) | 1 |

## Financial Accounts

85.     United States currency, funds and other monetary instruments credited to the following account numbers and up to the following amounts:

| Financial Institution | Account No. | Amount |
|----------------------|-------------|--------|
| Armed Forces Bank N.A. | xxxx1188 | $113,000 |
| Armed Forces Bank N.A. | xxxx7364 | $28,599.65 |
| Bank of Lee's Summit | xxxx4957 | $134,339.58 |
| Bank of Lee's Summit | xxxx9958 | $13,924.70 |
| Bank of Lee's Summit | xxxx5208 | $12,586 |
| Bank of Lee's Summit | xxxx2870 | $552,052.51 |
| Blue Ridge Bank & Trust | xxxx9489 | $229,037.78 |
| Blue Ridge Bank & Trust | xxxx1584 | $100,000 |
| Citizens State Bank | xxxx0315 | $95,000 |
| Commerce Bank | xxxx7415 | $276,648.90 |
| First Bank of Missouri | xxxx2931 | $100,000 |
| LPL Financial | xxxx0429 | $297,000 |
| Minnesota Life Insurance | xxxx454W | $200,000 |

## Real Property

86.     Real property located at 155 Street of Dreams, Village of Loch Lloyd, Missouri 64012, together with all its buildings, appurtenances, and improvements and is more fully

21

described as: Lot 15, Block 5, Street of Dreams at Loch Lloyd Phase Six, a subdivision in Cass County, Missouri, for which Wilson and his spouse are the recorded owners.

87. Real property located at 7514 E. Wolf Canyon Circle, Mesa, Arizona 85207, together with all its buildings, appurtenances, and improvements and is more fully described as: Lot 552, Mountain Gate at Las Sendas, According to Book 538 of Maps, Page 38, Records of Maricopa County, Arizona, for which Wilson and his spouse are the recorded owners.

## Money Judgment

88. At least $13,819,522 in United States currency, representing the amount of proceeds obtained as a result of the offenses set out in Count One, for which the defendants are jointly and severally liable.

## Forfeiture Allegation II (major government fraud)

89. Upon conviction of one or more of the offenses alleged in Counts Two through Five, the defendants, Jeffrey K. Wilson, Paul R. Salavitch, and Patriot Company Inc. shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(3), any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to the following:

## Financial Accounts

90.     United States currency, funds and other monetary instruments credited to the

following account numbers and up to the following amounts:

| Financial Institution | Account No. | Amount |
|---|---|---|
| Armed Forces Bank N.A. | xxxx1188 | $113,000 |
| Armed Forces Bank N.A. | xxxx7364 | $28,599.65 |
| Bank of Lee's Summit | xxxx4957 | $134,339.58 |
| Bank of Lee's Summit | xxxx9958 | $13,924.70 |
| Bank of Lee's Summit | xxxx5208 | $12,586 |
| Bank of Lee's Summit | xxxx2156 | $21,139.86 |
| Bank of Lee's Summit | xxxx2870 | $552,052.51 |
| Blue Ridge Bank & Trust | xxxx9489 | $229,037.78 |
| Blue Ridge Bank & Trust | xxxx1584 | $100,000 |
| Citizens State Bank | xxxx0315 | $95,000 |
| Commerce Bank | xxxx7415 | $276,648.90 |
| First Bank of Missouri | xxxx2931 | $100,000 |
| LPL Financial | xxxx0429 | $297,000 |
| Minnesota Life Insurance | xxxx454W | $200,000 |

## Real Property

91.     Real property located at 155 Street of Dreams, Village of Loch Lloyd, Missouri

64012, together with all its buildings, appurtenances, and improvements and is more fully

described as: Lot 15, Block 5, Street of Dreams at Loch Lloyd Phase Six, a subdivision in Cass

County, Missouri, for which Wilson and his spouse are the recorded owners.

92.     Real property located at 7514 E. Wolf Canyon Circle, Mesa, Arizona 85207,

together with all its buildings, appurtenances, and improvements and is more fully described as:

Lot 552, Mountain Gate at Las Sendas, According to Book 538 of Maps, Page 38, Records of

Maricopa County, Arizona, for which Wilson and his spouse are the recorded owners.

**Money Judgment**

93. At least $9,268,788 in United States currency, representing the amount of proceeds obtained as a result of the offenses set out in Counts Two through Five, for which the defendants are jointly and severally liable.

**Forfeiture Allegation III (money laundering)**

Upon conviction of one or more of the offenses alleged in Counts Seven and Eight, defendant Jeffrey K. Wilson shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to the following:

**Financial Accounts**

94. United States currency, funds and other monetary instruments credited to the following account numbers and up to the following amounts:

| Financial Institution | Account No. | Amount |
|---|---|---|
| Bank of Lee's Summit | xxxx5208 | $12,586 |
| Blue Ridge Bank & Trust | xxxx9489 | $229,037.78 |
| LPL Financial | xxxx0429 | $297,000 |
| Minnesota Life Insurance | xxxx454W | $200,000 |

**Real Property**

95. Real property located at 155 Street of Dreams, Village of Loch Lloyd, Missouri 64012, together with all its buildings, appurtenances, and improvements and is more fully described as: Lot 15, Block 5, Street of Dreams at Loch Lloyd Phase Six, a subdivision in Cass County, Missouri, for which Wilson and his spouse are the recorded owners.

96. Real property located at 7514 E. Wolf Canyon Circle, Mesa, Arizona 85207, together with all its buildings, appurtenances, and improvements and is more fully described as:

24

Lot 552, Mountain Gate at Las Sendas, According to Book 538 of Maps, Page 38, Records of Maricopa County, Arizona, for which Wilson and his spouse are the recorded owners.

## Money Judgment

97.     A money judgment representing the amount of proceeds involved in or traceable to the offenses set out in Counts Seven and Eight.

## Substitute Assets

98.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred, sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficult;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 21, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of forfeitable property.

A TRUE BILL.

_____/s/ Carla F. Eye_____
FOREPERSON OF THE GRAND JURY

/s/ Jane Pansing Brown_____
Jane Pansing Brown
Assistant United States Attorney

/s/ Stacey Perkins Rock_____
Stacey Perkins Rock
Assistant United States Attorney

Dated: _____1/13/17_____          Kansas City, Missouri