**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

JEFFREY K. WILSON,

        Defendant.

Case No.  17-00024-01-CR-W-HFS

**GOVERNMENT'S SENTENCING MEMORANDUM**

**I.  Introduction and Factual Summary**

The United States, through its undersigned counsel, provides this memorandum in advance of sentencing set for June 27, 2018, and recommends this Court sentence defendant Jeffrey K. Wilson to 18 months' incarceration, three years' supervision, and order defendant to pay the mandatory $100 special assessment pursuant to the parties' binding § 11(c)(1)(C) plea agreement.  ECF No. 28.

The defendant pleaded guilty to one count of major program fraud and in so doing, admitted his participation and leadership in a $13.7 million fraud scheme. Jeffrey K. Wilson used the service-disabled veteran (SDV) status of Paul R. Salavitch and Patriot Company Inc. (PCI) in a rent-a-vet scheme to defraud the United States into awarding more than $13.7 million in 20 federal contracts set aside for award to legitimate service-disabled veteran owned small businesses (SDVOSBs).  The proceeds of the scheme primarily benefited Wilson because the set-aside contract work was passed through to his own privately-owned construction company.  The

1

scheme not only harmed the Government's objective to encourage the vitality of small, disadvantaged enterprises but also harmed legitimate SDVOSBs who could not compete with the defendant's award-winning bids.

PCI was formed in 2005 with Wilson as minority owner and was awarded its first SDVSOB contract in 2009 on the heels of the Great Recession. PSR ¶¶ 8-9 (Wilson emailed, "Hey, any damn work we get these days is great news"); *see also* Fed. Res. Hist., The Great Recession and its Aftermath (as of 11/22/2013), http://www.federalreservehistory.org/essays/great_recession_and_its_aftermath (2007-09 identified as the deepest recession since WWII with economic weakness persisting even after the official end of the recession in June 2009). Intentionally and knowingly violating the law, Wilson actively managed and controlled PCI's day-to-day operations and long-term decision making. PSR ¶¶ 9, 13 (Wilson emailed, "You either figure out a way to play, or sit on the bench" and "Mission Legit is underway!"). In one instance, Wilson brazenly challenged the Government's award of a set-aside contract to another SDV bidder and it appears PCI ultimately fraudulently obtained that contract.

In the plea agreement, Wilson admitted generally that over the course of three years, he falsely certified on more than 10 contracts that PCI was eligible for set-aside contracts, and he more specifically admitted that on the basis of a bid he prepared and directed the SDV to sign, on or about July 31, 2013, the Government awarded PCI a contract valued at approximately $2,527,709. This specific instance of major program fraud occurred less than a year after PCI lost, then fraudulently

regained, its certification on the issue of SDV control. PCI unsuccessfully challenged cancellation of its SDV status after a September 2013 site-visit revealed that the SDV was working full-time as a federal employee 40 miles away from PCI operations, did not actively manage or control PCI and that Wilson had undue influence over the SDV and PCI.

## II. Sentencing Recommendation

### A.    Guidelines Issues

Probation calculated the base offense level at 6 pursuant to § 2B1.1 with a 20 level enhancement for loss amount between $9.5 million and $25 million and applied two enhancements. PSR ¶¶ 38-42. The first enhancement added two levels for sophisticated means pursuant to § 2B1.1(b)(10)(C), and the second enhancement, agreed to by the parties, added two levels for the defendant's role in the offense as organizer, leader, manager or supervisor pursuant to § 3B1.1(c). After applying a three-level reduction for acceptance of responsibility, the total offense level is 27, and with a Criminal History Category I, the advisory sentencing range is 70 - 87 months. PSR ¶¶ 46-48, 52-53, 72.

Defendant objected to calculation of the loss amount and asserted loss to the Government was zero. PSR Addendum p. 5. Defendant also objected to application of the Sophisticated Means enhancement. PSR Addendum p. 6.

**1.  An unambiguous federal statute on point governs loss amount.**

An unambiguous federal statute directly on point mandates that loss be measured as the full value of contracts.  Title 15, United States Code, Section 632(w) provides in relevant part:

> In every contract, subcontract…or grant which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract, subcontract…or grant whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

To promote small business development and viability, Congress created the Small Business Administration in 1953 to "aid, counsel, assist and protect … the interests of small business concerns…in order to…insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government…be placed with small business enterprises… ."  15 U.S.C. § 631(a).  To that end, federal agencies, including the Department of Veterans Affairs (VA) are required to restrict competition on some federal contracts to small businesses. *Kingdomware Technologies, Inc. v. U.S.*, 136 S.Ct. 1969, 1973 (2016) ("In an effort to encourage small businesses, Congress has mandated that federal agenices restrict competition for some federal contracts.").  The Small Business Act (SBA) requires federal agencies to set annual goals for set-aside contracts, including those set aside for SDVOSBs.  15 U.S.C. § 644(g)(1)(B); *see also Kingdomware Technologies, Inc.*, 136 S.Ct. at 1973.  VA's goals for SDVOSB set-aside contracts are set forth at 38 U.S.C. § 8127(a)(1).  VA's annual goal for SDVOSB set-aside contracts can be no less than the Government-wide goal under the SBA.  15 U.S.C. § 644(g)(1).  The SBA defines an SDVOSB in part as one in which the SDV manages and controls the

4

day-to-day business operations of the business. 15 U.S.C. § 632(q)(2)(B) (incorporating by reference the definition of 'service-disabled veteran' found in Title 38 which governs VA). Title 38 contracting goals and preferences for VA explicitly do not supersede or otherwise affect the authorities contained in the SBA at 15 U.S.C. § 631, *et seq. See* 38 U.S.C. § 8127(j)(2).

A Congressional Research Service (CRS) report noted that regular reports of small business contracting program fraud led Congress to make fraud prevention a priority. *SBA Veterans Assistance Programs: An Analysis of Contemporary Issues*, C.R.S. R42695 at p. 23, June 5, 2014 ("Of particular interest to veterans, GAO has found that 'the lack of an effective government-wide fraud-prevention program' has left the service-disabled veteran owned small business program 'vulnerable to fraud and abuse'). In 2010, Congress specifically addressed the issue of how to quantify loss in a small business fraud scheme. As part of the Small Business Jobs Act, Congress enacted a statutory presumption that loss in such a scheme is equal to the full value of the contracts obtained. 15 U.S.C. § 632(w).

The Senate Committee on Small Business and Entrepreneurship considered this exact language in the context of another proposed Act and emphasized that it creates an "irrefutable presumption of a dollar-for-dollar loss to the United States in every contract . . . reserved for small business concerns which is obtained by misrepresentation of small business size or status." *See* S. Rep. No. 111-343 at 8 (2010)[1]. The Committee also stated that it intended "that this presumption shall be applied *in all manner* of criminal, civil, administrative, contractual, common law, or

---

[1] This Senate Report accompanied bill S. 2989, 111th Cong. (2010), which the Senate Committee on Small Business and Entrepreneurship unanimously reported on March 4, 2010, on which the full Senate ultimately did not vote. That Senate bill, however, contained the same presumption-of-loss language quoted above, which Congress later passed in 2010 (Small Business Jobs Act of 2010 (H.R. 5297)), and which the President signed into law on September 27, 2010 (Pub. L. 111-240).

Case 4:17-cr-00024-HFS   Document 47   Filed 06/20/18   Page 5 of 18

other actions, which the United States government may take to redress such fraud and misrepresentation." *Id.* (emphasis added).

The Small Business Jobs Act became effective on September 27, 2010[2], the date it was signed into law. Since the statutory language is clear and unambiguous, the Court need not apply any other canons of statutory construction to interpret it. *See Kingdomware Technologies, Inc.*, 136 S.Ct. at 1976-77 (2016) (where statutory language is unambiguous in the context of a coherent and consistent statutory scheme, Congress' use of 'shall' creates clear mandate).

Subsequent to the enactment of the statutory presumption of loss, CRS issued a pertinent report. The CRS analyst noted, "Partly in response to concerns about fraud in the small business contracting programs, the 111th Congress enacted legislation which provides that ineligible small businesses may not receive an 'offset' or 'credit' for the value of the goods or services they supplied to the government when the amount of 'loss to the United States' is calculated for purposes of … the U.S. Sentencing Guidelines, among other purposes." *Federal Contracting and Subcontracting with Small Business*, U.S. C.R.S. R42390 at p. 35, January 23, 2013.

There is, however, a circuit split on the Guidelines calculation of loss for fraudulently obtaining contracts set aside for disadvantaged groups. It is notable that none of the Circuit decisions issued after the September 27, 2010, enactment of the statutory presumption addressed the presumption of loss. The 8th Circuit has not ruled on the issue.

---

[2] Only three PCI contracts were awarded prior to the enactment date of § 632(w). The combined value of those three contracts is $513,744. Even if those contracts are not included at all in the loss amount, the 20 level enhancement still applies because the remaining contract value is still more than $9,500,000.

The 5th, 3rd and 9th Circuits offset the value of services rendered against the full contract amount based on different Guidelines' application notes while the 7th, 11th and 4th Circuits upheld the full value of contracts as the loss amount. *United States v. Harris*, 821 F.3rd 589, 601-08 (5th Cir. 2016) (general rule of loss at § 2B1.1 offset by fair market value of services rendered); *United States v. Nagle*, 803 F.3d 167, 179-80 (3rd Cir. 2015) (non-federal set-aside contract loss is either procurement fraud at § 2B1.1, n.3(A)(v)(II) or government benefit at n.3(F)(ii) offset by fair market value of services rendered); *United States v. Martin*, 796 F.3d 1101, 1108-12 (9th Cir. 2015) (procurement fraud at § 2B1.1, n.3(A)(v)(II) offset by fair market value of services rendered, noting potential pecuniary loss to both the Government in paying premium for non-open market bidding and to other disadvantaged businesses who otherwise could have been awarded contracts); *cf. United States v. Giovenco*, 773 F.3d 866, 870-71 (7th Cir. 2014) (regulatory approval obtained by fraud at § 2B1.1, n.3(F)(v) with no credit for services rendered); *United States v. Maxwell*, 579 F.3d 1292, 1305-07 (11th Cir. 2009) (government benefits at §2B1.1, n.3(F)(ii) with no offset for value of services rendered; pre-statutory presumption); *United States v. Brothers Constr. Co. of Ohio, Inc.*, 219 F.3d 300, 317-18 (7th Cir. 2000) (government program benefits with no offset for value of services rendered; pre-statutory presumption).

The circuit split is distilled in two recent district court opinions rendered in the District of Columbia. The better reasoned and more factually analogous case *United States v. Singh*, 195 F.Supp.3d 25 (D. D.C. 2016) involved 26 federal set-aside contracts valued at approximately $8.5 million fraudulently procured and passed through to a non-eligible business over the course of three years. *See Id*. at 28. Singh was sentenced to 15 months after pleading guilty to a one-count Information charging §§ 371 and 1031 conspiracy to commit major program fraud. *United States v. Tarsem Singh*, Case No. 15-cr-00173-RBW (D. D.C.), ECF No. 26. The *Singh* court followed

7

the 4th, 7th and 11th Circuits in applying the special rule for government benefits at U.S.S.G. § 2B1.1, n.3(F)(ii). *Singh*, 195 F.Supp.3d at 28-30. The Court cited the statutory presumption at 15 U.S.C. § 632(w) and reasoned that "[the] reading of the Guidelines by the Fourth, Seventh and Eleventh Circuits comports with the unambiguous intentions of Congress as articulated in the Small Business Jobs Acts of 2010…" *Id.* at 30. The Court noted that regulations promulgated to implement the presumption make clear that the presumption may be rebutted only with proof of "unintentional errors, technical malfunctions, and other similar situations that demonstrate that a misrepresentation of size was not affirmative, intentional, [or] willful…" *Id.* (quoting 13 C.F.R. § 121.108(d) (2016)). The *Singh* decision rejected the 9th, 5th and 3rd Circuit decisions which followed the general rule of actual or intended loss with offset for value of services rendered. The *Singh* court found the 9th Circuit's *Martin* decision internally inconsistent in interpreting the plainness or ambiguity of examples of the special rule for government benefits while failing to account for the plainly clear and unambiguous federal statute on point. *Singh,* 195 F.Supp.3d at 31-2 (noting the Sentencing Commission does not have the authority to override a statute). The 5th Circuit's *Harris* decision was unpersuasive because it, like the 9th Circuit decision, failed to consider the impact of § 632(w). *Singh,* 195 F.Supp.3d at 32. The Court easily dispensed with the 3rd Circuit's *Nagle* decision as it involved state administered program not directly subject to the federal statutory presumption. *Singh,* 195 F.Supp.3d at 32-3.

After *Singh*, an opposite result was reached in *United States v. Crummy*, 2017 WL 1411461 (D. D.C. 2017) in which the district court credited the value of services rendered against the fraudulently obtained contracts. *Crummy* is easily distinguishable on its facts from this case. Crummy joined a pre-existing scheme and participated only in fraudulently obtaining two contracts with a combined value of

8

approximately $1.6 million. *See Id.* at *1-*3. Crummy was sentenced to 12 months' probation. *Id.* at * 1. Here, defendant Wilson was not merely a participant, but led the scheme from its inception and fraudulently obtained more than $13 million in SDVOSB contracts in a scheme that lasted at least four years. The *Crummy* court focused on pecuniary, rather than non-pecuniary, loss as the measure of loss under § 2B1.1. *See Id.* at *4. Notably, the two isolated contracts tied to Crummy both resulted in actual pecuniary loss to the fraudsters. *See Id.* at *3. Even more relevant for Wilson's sentencing, the *Crummy* court noted grounds for departure and variance from the Guidelines where the § 2B1.1 loss chart fails to adequately represent the full loss as discussed below.

However, should the Court disregard the statutory presumption of loss in favor of applying § 2B1.1, application note 3(A)(v)(II), procurement fraud, with an offset for services rendered pursuant to application note 3(E)(i), the Guidelines calculation still results in a loss which renders an 18 month sentence reasonable and just. The Government is prepared to put on evidence of reasonably foreseeable administrative expenses it incurred in ferreting out and correcting the fraud. *See* U.S.S.G. § 2B1.1, n.3(A)(v)(II); *see also Crummy*, 2017 WL 1411461 at *7 (citing the 9th Circuit *Martin* decision specifying that reasonably foreseeable administrative costs to correct the fraud are part of the Government's pecuniary loss). The Government expended substantial resources to investigate, uncover and stop the fraud. Two agencies, the VA and GSA, tasked two special agents and a financial analyst with primary responsibility to investigate PCI. The investigation operated covertly for over a year before dozens of special agents were tasked with executing a federal search warrant and conducting interviews. This undertaking included not only investigative time but also substantial travel expenses as agents traveled from across the country, putting their primary assignments aside to assist. Post-indictment, the VA initiated

9

debarment proceedings against PCI and defendant Wilson. These reasonably foreseeable investigative and corrective actions stopped the scheme and prevented PCI and the defendant from further defrauding the government, all of which came at considerable expense to the Government.

However, even if the Court finds no loss under either the statutory mandate or a Guidelines analysis, a departure or variance from the Guidelines to impose an 18 month sentence may be appropriate under the circumstances. The loss to the integrity of the Government program was substantial. Before the Government uncovered the fraud, Wilson used PCI for years to keep his own construction company afloat and line his pockets personally. Such blatant disregard for the integrity of a program funded by the U.S. Treasury and designed to assist veterans who have served our country, more particularly veterans who suffered a disability as a result of their service, cannot go unpunished or treated lightly. To mechanically credit services rendered from the value of fraudulently obtained contracts results in a serious and substantial understatement of the seriousness of this offense. *See* U.S.S.G. § 2B1.1, n.20(A)(ii); *see also Crummy*, 2017 WL 1411461 at *7 (upward departure may be warranted where the offense level substantially understates the seriousness of the offense due to substantial non-pecuniary harm). For the same factual reasons, where the offense level does not reflect the full scope of harm, the Court may vary upward from the Guidelines. U.S.S.G. § 5K2.0(a); *see also Crummy* 2017 WL 1411461 at *7 (factors warranting upward variance include the number of contracts fraudulently obtained or the length of time the defendant participated in the scheme.) Should the Court be inclined to dispense with Probation's calculation of loss and the statutory presumption, this is clearly a case warranting a departure or variance from the Guidelines which do not adequately reflect the seriousness or scope

of the offense where services rendered are offset from fraudulently obtained contracts.

To be clear, the Government's position is that the clear statutory mandate renders the commentary to the Guidelines inconsistent with congressional intent. Indeed, as the Supreme Court opined, "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Given the clear congressional mandate and the lack of binding precedent, this Court should find that the full value of contracts fraudulently obtained by defendant Wilson is the appropriate measure of loss for Guidelines analysis and apply the 20 level enhancement.

## 2. Wilson used sophisticated means to effectuate the fraud scheme.

"The sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, 'was notably more intricate than that of the garden-variety [offense].'" *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009) (quoting *U.S. v. Hance,* 501 F.3d 900, 909 (8th Cir.2007)). "Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *United States v. Finck*, 407 F3d. 908, 915 (8th Cir. 2005). While there is no mechanical test to apply the sophisticated means enhancement, duration of the scheme and use of false documents are relevant factors. *See United States v. Atkins*, 881 F.3d 621, 627 (8th Cir. 2018). These factors clearly weigh in favor of applying the sophisticated means enhancement to Wilson's conduct in this case. This multi-million dollar

11

scheme continued uninterrupted for at least four years. Wilson directed that military items be placed in the SDV's purported office, directed that PCI business cards be created but that the SDV's business card explicitly not include his cell phone number. On more than one occasion Wilson drafted documents for the SDV's signature, personally made certifications he knew to be false in government databases and organized and directed others' participation in the scheme.

**B.    The defendant should be sentenced to 18 months' imprisonment followed by three years' supervised release.**

The United States recommends this Court, regardless of its finding on loss amount, impose a sentence of 18 months' imprisonment followed by three years of supervised release as sufficient but not greater than necessary to comply with sentencing purposes set forth at 18 U.S.C. § 3553(a)(2).

**1.    The nature and circumstances of this scheme offense weigh in favor of an 18 month sentence.**

The defendant's years-long scheme to enrich himself at the expense of actual SDVs and the Government, particularly at a time when the U.S. economy was exceptionally weak and small businesses were struggling, was a serious crime and betrayal of an important program to help veterans build productive businesses. The defendant should be held accountable for his greed. Wilson and his own privately owned construction company used an SDV's status to obtain 20 contracts over the course of at least four years. These contracts were valued conservatively at $13.7 million. Due to additional work required on many of those contracts, PCI and Wilson,

12

shielded by PCI, gained in excess of that amount even after the scheme was uncovered.

The fact that the parties agreed that no restitution would be ordered pursuant to the binding plea does not mean that this was a victimless crime. Rather, it is impossible to identify with any certainty which SDVOSBs lost out on the contracts awarded to PCI. However, in at least one instance, an SDVOSB which had tentatively been awarded a contract based on its bid ultimately lost that contract award because this defendant protested the award. At a time when the U.S. economy was still contracting due to the recession, the implication of this defendant's crime on these nameless SDVOSBs cannot be overstated.

Further, as the *Martin* court alluded, the Government likely paid a premium on the set-aside contract awards that it would not have incurred had the contracts been open for bid on the free market. "The [set-aside] programs are designed to benefit disadvantaged businesses. It is conceivable that the government paid a premium contract price above what it would pay for other contracts under normal competitive bidding procedures. Any such difference would be an actual loss resulting from Martin's fraud." *United States v. Martin*, 796 F.3d at 1101. Wilson's private construction company distorted the bidding process in a pool set aside for small, disadvantaged businesses. Wilson and his private construction company had an unfair advantage each time PCI bid on set-aside contracts, an advantage Wilson would not have enjoyed on the open market. It stands to reason that on the open

13

market, the Government could have obtained even lower bids for the contract work, and suffered an unascertainable pecuniary loss as a result of the defendant's crime.

Finally, the Government suffered harm to the integrity of its program. Congress saw fit to set aside a certain percentage of government contracts to help spur development among disadvantaged sectors of society, including service-disabled veterans seeking to engage meaningfully in the economy. The Government cannot micromanage nation-wide programs and relies on the truthfulness of certifications made to it by those who participate in its programs. This defendant took advantage of that trust and diverted millions of dollars' worth of work away from intended recipients of the program. If the Court finds loss occurred as a result of the defendant's crime but the loss is too difficult to ascertain, the Court may use the defendant's gain an alternate to loss calculation. U.S.S.G. § 2B1.1, n.3(B). One measure of the defendant's gain is the assets to which he claimed ownership interest in the two related civil forfeiture cases, *United States v. $113,000 et al*, Case No. 15-00847-CV-W-GAF and *United States v. Real Property located at 115 Street of Dreams, et al*, Case No. 15-00602-CV-W-GAF. The defendant claimed interest in approximately $2.1 million seized from accounts he controlled as well as ownership of two unencumbered properties, both of which he purchased during the scheme. Even based on a conservative estimate of the defendant's gain based on those claims, a 16-level enhancement would apply for more than $1,500,000 gain, as opposed to the 20-level enhancement for the full value of the contracts. Thus, even if the Court finds

14

loss to difficult to ascertain, the defendant's gain amply supports imposition of an 18 month sentence.

> **2.     The history and characteristics of the defendant support a substantial term of incarceration.**

Jeffrey Wilson is not a service-disabled veteran.  In fact, he's not an Armed-Services veteran at all.  Wilson owned and operated a successful construction company in the Kansas City area when he decided to defraud the United States Government, and in the process, Wilson denied legitimate SDVs the opportunity to build their own small businesses.  The fact that his scheme went on, uninterrupted, for at least four years, demonstrates that the defendant's conduct was not aberrant behavior.  Wilson did not stop violating the law even after the Government's site visit to PCI in September 2013.   Instead, Wilson and the SDV fought cancellation of PCI's SDVOSB status.  Wilson has no prior criminal history, which supports a sentence of 18 months as sufficient but not greater than necessary given the duration of the fraud and the number of lucrative multi-million dollar contracts stolen from deserving SDVs.

> **3.     A sentence of 18 months will promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct and protect the public.**

To provide just punishment, Wilson warrants 18 months' incarceration followed by a significant period of supervision.  To achieve general deterrence, honest citizens and construction companies who do business with the Government should

see that those who defraud the Government, like Wilson acting through PCI, face a prison sentence.

Defendant and other future white-collar criminals should know that if they defraud the Government in the context of set-aside contracts and get caught, they will not escape with the pithy excuse that the Government didn't suffer loss because the defendant performed so well on contracts intended for other, disadvantaged groups. Nor should previously well-regarded, middle-class defendants successfully argue that by losing their reputation and agreeing to civil forfeiture, they have been punished enough. This argument sets up an unjust two-tiered system in which defendants with the means to pay forfeiture and restitution face far less punishment than indigent defendants.

To promote respect for the law and adequately deter this particular defendant and others, a sentence of 18 months' imprisonment should be imposed.

**4.  An 18 month sentence is appropriate to avoid unwarranted sentencing disparities.**

Due to the diametrically opposite determinations on loss in the circuits which have considered set-aside contract fraud, the parties agreed to a binding sentencing range of up to 18 months. A sentence at the top of this range is appropriate given the duration of the scheme, the number of contracts awarded to the tune of millions of dollars which directly correlated to lost opportunities for legitimate SDVOSBs, in light of the fact that contract work was completed on necessary government projects.

16

## C. Recommended Sentence for Monetary Penalties

The parties agreed that there are no identifiable victims so restitution will not be imposed. The parties also agreed that no fine and no criminal forfeiture would be imposed as part of the binding plea. ECF No. 28, p. 6, ¶ 6(a). The defendant consented to civil forfeiture proceedings as detailed in the plea. *Id*. at p. 7, ¶ 6(a) and (f).

## III. CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court sentence defendant Jeffrey K. Wilson to 18 months' incarceration followed by three years' supervised release and order defendant to pay the $100 mandatory special assessment.

Respectfully submitted,

Timothy A. Garrison
United States Attorney

By     */s/ Stacey Perkins Rock*

Stacey Perkins Rock
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

17

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on June 20, 2018, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

*/s/ Stacey Perkins Rock*

Stacey Perkins Rock
Assistant United States Attorney

18